T.C. Memo. 2008-222


UNITED STATES TAX COURT


CYNTHIA G. WILCOX, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 9907-02, 22015-03,  Filed October 1, 2008.
        22590-04.


<u>Mitchell I. Horowitz</u>, for petitioner.

<u>Michael D. Zima</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


WELLS, <u>Judge</u>:  Respondent determined the following deficiencies in income tax and penalties for petitioner's respective taxable years:

|       |            | Penalty      |
| Year  | Deficiency | Sec. 6663    |
|-------|------------|--------------|
| 1997  | $320,441   | $240,330.75  |
| 1998  | 400,372    | 300,279.00   |
| 1999  | 334,303    | 250,727.25   |
| 2000  | 153,165    | 114,874.00   |

The issues we must decide are:  (1) Whether petitioner has substantiated the existence or amounts of any foreign tax credits for the taxable years 1997, 1998, 1999, and 2000; (2) whether respondent has established that petitioner is liable for the fraud penalty pursuant to section 6663[1] for taxable years 1997, 1998, 1999, and 2000; and (3) whether petitioner has established that she is not liable, in the alternative, for a penalty pursuant to section 6662(a).

                         FINDINGS OF FACT

     Some of the facts and certain exhibits have been stipulated. The parties' stipulations of fact are incorporated herein by reference and are found as facts.  Petitioner resided in Washington, D.C., at the times the petitions were filed.

     Petitioner earned a marketing degree from the College of William & Mary.  She operated her own advertising and consulting business, Wilcox Advertising, Inc., before the taxable years in issue.  She closed it down in 1992 or 1993.

---

[1]Unless otherwise indicated, all Rule references are to the Tax Court Rules of Practice and Procedure, and all section references are to the Internal Revenue Code, as amended.

Petitioner filed income tax returns for taxable years 1997, 1998, 1999, and 2000, claiming foreign tax credits for taxes paid to the Russian Federation. Petitioner's tax returns for the taxable years in issue each list her occupation as "Public Relations". On March 29, 2002, respondent issued a notice of deficiency to petitioner determining deficiencies in her income tax for taxable years 1997 and 1998 as set forth above. On October 2, 2003, respondent issued a notice of deficiency to petitioner determining a deficiency in her income tax for taxable year 1999 as set forth above. On August 24, 2004, respondent issued a notice of deficiency to petitioner determining a deficiency in her income tax for taxable year 2000 as set forth above. In each of the notices respondent disallowed petitioner's claimed foreign tax credits for lack of substantiation.

For the taxable years in issue, the record does not contain any receipts showing the payment of taxes by petitioner to the Russian Ministry of Taxation or any record of payment from petitioner's Russian employer, Multifunctional Cooperative Energia, also known as Diversified Cooperative Energia (Energia). The Russian Government informed the U.S. Internal Revenue Service (IRS) that petitioner was not registered as a taxpayer in the Moscow tax office and that petitioner did not file income tax returns in Russia for any of the taxable years in issue. The Russian Ministry of Taxation informed the IRS that it had no record of petitioner on their tax rolls and that she did not pay

any income taxes to the Russian Government during the taxable years in issue. Energia had not filed tax returns or paid any taxes in Russia since either 1993 or 1995.

Petitioner's accountants, Kirkland, Russ, Murphy & Tapp (KRMT), prepared petitioner's income tax returns from information she furnished. KRMT made no attempt to verify the information petitioner provided.

Petitioner did not maintain any foreign bank accounts or interests in foreign trusts. There are no bank statements, deposit slips, or wire transfer records from any of petitioner's bank accounts during the taxable years in issue evidencing a deposit from Energia or a payment to the Russian Government or the Moscow city government.

There are no deposits into any of petitioner's accounts during 1997 which match in amount any of the monthly salary or housing allowance amounts detailed in the letters purporting to be from Energia that petitioner presented to the IRS, nor in an amount matching a 1997 bonus which she alleges to have received from Energia.

During 1997 there were no deposits into any of petitioner's accounts of $9,612, $9,802, $9,900, or $9,960, which are the amounts of monthly salary payments net of Russian withholding taxes which petitioner alleges to have paid to the Russian Government for that taxable year. Additionally, there was no deposit into any of petitioner's accounts during 1997 of

$468,520, which is the bonus payment net of Russian withholding tax petitioner alleges she was paid from Energia.

During 1998 there was no deposit into any of petitioner's accounts of $64,513, which is the total of the 1998 monthly salary payment net of Russian withholding tax petitioner alleges she was paid from Energia.

Petitioner did not offer any written evidence of a contract for her services indicating the manner in which her bonus or commissions that she alleges were to be paid by Energia were to be calculated. Petitioner did not offer any pay stubs or other written evidence reflecting payments of salary, bonuses, or commissions from Energia. Petitioner did not offer records of the manner in which her bonus or commission amounts to be paid by Energia were accruing or the amount and/or value of diamond sales from which such bonuses or commissions would be computed.

During 1997 petitioner twice traveled to Russia. On the first trip petitioner entered February 4 and departed February 10. On the second trip petitioner entered March 7 and departed on an unknown date.

On May 5, 1998, petitioner gave birth to a son, DK.[2] DK lived with petitioner from the time he was born throughout the taxable years in issue. After giving birth to DK, petitioner did

---

[2]The Court generally refers to minor children by their initials. See Rule 27(a)(3).

not work for several months.  Petitioner did not travel to Russia during the last 4 months of 1997 or during 1998.

Petitioner rented an apartment and lived "on and off very often" in Belgium between 1994 and 1997 and again during 1999, particularly while her son Bradford Hamilton Wilcox, who was born on March 3, 1979 (Bradley), was going to school in Switzerland. On May 5, 1997, petitioner married Menachem Josef Kaszirer (Mendy Kaszirer) and remained married to him throughout the taxable years in issue.  Mendy Kaszirer is a Belgian citizen.  However, Mendy Kaszirer's mother is Russian, and he was born in Russia. Petitioner continues to share a house in Belgium with her husband Mendy Kaszirer.

Petitioner traveled to Russia three times during 1999, the first entering March 29 and departing April 12, the second entering April 23 and departing on an unintelligible date, and the third entering May 31 and departing June 2.  Petitioner was pregnant during 1999.  Petitioner did not travel to Russia during 2000.  Petitioner's Russian travel visa was revoked in 2001.

Mendy Kaszirer and his father, Ignatie Kaszirer, started Kaszirer Diamonds, N.V., a diamond company which became one of the largest in the world.  Kaszirer Diamonds declared bankruptcy during 1996 or thereabouts.

Mendy Kaszirer had been doing business in Russia for 30 years before 1993.  Mendy Kaszirer spoke Russian fluently.

Petitioner was not fluent in Russian during the taxable years in issue.

Mendy Kaszirer had great knowledge of the diamond business. Petitioner knew nothing about the diamond business before meeting him. Mendy Kaszirer's knowledge of the diamond business remained substantially greater than petitioner's during the years in issue.

Kaszirer Diamonds had business interests in Russia, including joint ventures, and the company purchased diamonds in Russia. Kaszirer Diamonds was one of the major partners in the "Intertrade" joint venture. Mendy Kaszirer was one of the contacts for Kaszirer Diamonds with whom petitioner worked on the "Intertrade" joint venture.

Kaszirer Diamonds was one of the partners in the "Victoria" joint venture. At trial, petitioner recalled that Kaszirer Diamonds was a partner in the Victoria joint venture, but she could not remember with whom she dealt from Star Diamond or the factory. Mendy Kaszirer was the party from Kaszirer Diamonds with whom she dealt on the "Victoria" joint venture.

Petitioner's job with Energia was to bring foreign investment to the Russian diamond trade, primarily through joint ventures. Petitioner helped facilitate the following joint ventures: Almaz Juvelier Export, which dealt with diamond polishing and made jewelry; Octoprom, a diamond polishing operation; Anastasia, which opened a location selling jewelry and polishing diamonds on Red Square; Imperial Trading, a diamond

polishing operation; and Rosshtern and Ornament Trading, diamond polishing.

Petitioner could not recall the names of the partners involved in Almaz Juvelier Export, Imperial Trading, or Rosshtern and Ornament Trading. Mendy Kaszirer knew better than petitioner the principals of the unnamed diamond company from Belgium owned by an Indian who was a party to the Rosshtern joint venture. Mendy Kaszirer met with Gary Harrod in Moscow when Gary Harrod went there.

Kaszirer Diamonds owned Quantex Diamonds, Inc., a servicing agent. David Josowitz (Mr. Josowitz) was the President of Quantex Diamonds, Inc. (Quantex), during the taxable years in issue. As of December 3, 1998, Mr. Josowitz had worked for Quantex for at least 20 years. Mr. Josowitz worked at the office of Quantex in New York, New York, during the years in issue. Mr. Josowitz first met petitioner through Mendy Kaszirer during 1993. Petitioner worked with Mendy Kaszirer during that time. Petitioner received wages of $300,000 during 1995 and $395,000 during 1996 from Kaszirer Diamonds.

Petitioner occasionally visited the offices of Quantex in New York during the taxable years in issue. Petitioner had no assigned duties at Quantex during the years in issue. While visiting the Quantex offices in New York during 1997, petitioner worked on designing a line of jewelry as a personal project.

Petitioner sold some jewelry on her own behalf during the taxable years in issue. On August 16, 1999, petitioner sold a 5-carat diamond ring to Cora Diamond Co. for $20,000. During 1999 petitioner sold a ring for $28,941 through Diacor International.

Petitioner represented to U.S. Trust Co. of New York that she had personal property, including jewelry, worth $700,000 as of November 19, 1998. Petitioner told U.S. Trust Co. of New York that she did not accrue any salary during 1997.

Petitioner owned and operated Millennium Penthouse, Inc. (Millennium), an S corporation, during all of the taxable years in issue. Millennium held title to a condominium at 1965 Broadway, Unit PH1E, New York, New York (1965 Broadway). The mortgage on 1965 Broadway called for a monthly payment of $11,775.80 and monthly maintenance fees of $1,300. A lease between Millennium and Quantex for 1965 Broadway called for a payment of $15,000 per month. Quantex did not use 1965 Broadway for any business purpose. Millennium also held title to a Miami, Florida, rental property, similar to a strip mall, that had tenants.

Only the Forms 1120S, U.S. Income Tax Return for an S Corporation, filed on behalf of Millennium for 1997 and 1998 report any rental income from Quantex and not of $15,000 per month. Only the Forms 1120S filed on behalf of Millennium for 1999 and 2000 report rental income from the tenants of the strip

mall in Miami. Millennium reported a net loss in each of the taxable years in issue.

Petitioner owned all of the outstanding shares of Harbour Group, Inc. During 1996 petitioner purchased all of the shares of Harbour Group, Inc., from Harbour Group, Ltd., a British Virgin Islands company, for $900,000, a price later decreased to $700,000. Harbour Group, Inc., was incorporated as a C corporation, and effective January 1, 1997, became an S corporation. Harbour Group, Inc., owned petitioner's residence at 917 Anchorage Road in Tampa, Florida. Harbour Group, Inc., also owned two boats valued at $350,000. Mendy Kaszirer was an agent for Harbour Group, Inc., and one of three individuals petitioner knew were involved with Harbour Group, Inc.

With the assistance of an attorney, petitioner applied for and received an exemption certificate so that Harbour Group, Inc., would not be required to withhold any tax under sections 897 and 1445 upon the payment of the purchase price of the home at 917 Anchorage Road in Tampa, to Harbour Group, Ltd., B.V.I.

Petitioner's plans were for Blue Diamond Trading, Inc. (Blue Diamond), to be a wholesale diamond business in Miami, Florida. Mendy Kaszirer was involved in operating Blue Diamond. Mendy Kaszirer helped procure and sell diamonds for Blue Diamond. Petitioner was the president and secretary of Blue Diamond. The monthly statements for Blue Diamond's corporate checking account at Mellon National Bank were mailed to petitioner and retained by

her accountant. Petitioner wrote most, if not all, of the checks on Blue Diamond's corporate checking account. Petitioner acted on behalf of Blue Diamond in directing an accountant to prepare and file tax returns on Blue Diamond's behalf. Blue Diamond paid petitioner $50,000 on December 23, 1998, and $25,000 on April 6, 1999. Blue Diamond had ceased operations by August 1999. In August 1999 petitioner, as president of Blue Diamond, entered into a wire transfer agreement with United National Bank. During June and July of 2000 petitioner paid herself travel expenses out of Blue Diamond's corporate checking account. Blue Diamond paid insurance premiums on behalf of petitioner, which Blue Diamond treated as salary payments.

Mendy Kaszirer acted as the trustee and was a beneficiary of several trusts. Mendy Kaszirer acted as trustee on behalf of the K Trust and the J & O Trust (Kaszirer family trusts). Mendy Kaszirer's three sisters were other beneficiaries of the Kaszirer family trusts. The Kaszirer family trusts held real property worth approximately $100 million. Mendy Kaszirer was accused by several Kaszirer family members of stealing the Kaszirer family fortune, including stealing diamonds from the family business and embezzling funds from a Kaszirer Diamonds, N.V. bank account. During 1997 Ignatie Kaszirer, Orlie Kaszirer Rechdiner, Anita Kaszirer Rosenberg, and Henri Rosenberg filed two lawsuits, Index Nos. 122134/97 and 401578/97, in the Supreme Court of the State of New York against Mendy Kaszirer. The purpose of the lawsuits

was to forcibly remove Mendy Kaszirer as a trustee of various family trusts of which they were beneficiaries. The trust lawsuits against Mendy Kaszirer settled without trials.[3]

During 1999 Mendy Kaszirer was accused of breaking Belgian laws. Mendy Kaszirer was arrested in the United States during 1999 and extradited to Belgium.

During 1999 while petitioner's audit was assigned to Revenue Agent Theodore Curtis (Agent Curtis), KRMT provided three letters to the IRS dated January 29, 1998. Petitioner represented those letters to be from Energia (Energia letters).

On February 24, 2000, petitioner informed KRMT that she did not have documentation for taxes paid to Russia. On June 4, 2001, petitioner provided to the IRS several Forms 3 allegedly issued by Energia relating to her taxable years 1997 and 1998. Form 3 is the Russian equivalent of a Form W-2, Wage and Tax Statement. The Energia letters and Forms 3 that petitioner's representatives provided to the IRS during the audit did not contain a KRMT Bates stamp number.

The Energia letters each contain a stamp or seal purporting to be the corporate seal of Energia. The purported stamp or seal on the Forms 3 differed from the seal registered by Energia with the Russian Government. The letterhead on the Energia letters

---

[3]Petitioner moved that the settlement documents be admitted into evidence under seal. We granted petitioner's motion and the documents are admitted solely for the purpose of proving the existence of settlements, not for the terms of the settlements.

did not include a mailing address, telephone number, facsimile number, or electronic mail address for Energia.

U.S. Trust Co. of New York provided only personal loans to its clients, not commercial loans. Petitioner led Diane Katz, a loan officer at U.S. Trust Co. of New York, to believe that petitioner was moving back to New York to live at 1965 Broadway, which petitioner was purchasing, and that petitioner would be working in New York City.

Petitioner represented to U.S. Trust Co. of New York that her monthly living expenses were $35,000. U.S. Trust Co. of New York determined that petitioner's living expenses were more accurately $100,000 per month.

Petitioner produced letters for loan companies indicating she was employed during 1998 by Quantex and Blue Diamond. Petitioner produced letters for loan companies indicating she was employed during 1999 by Anchor Diamond Importers, Inc. (Anchor Diamond).

Anchor Diamond paid for health insurance for petitioner. The amounts reflected on the Form W-2 issued by Anchor Diamond with respect to petitioner were not money paid directly to her but were for amounts paid to a health insurance company for petitioner's insurance.

Petitioner received Forms W-2 from Quantex for 1997 and 1998 reflecting wages of $10,200 and $3,600, respectively. Those amounts were not salary paid directly to petitioner but were

amounts paid to a health insurance company for petitioner's insurance.

Petitioner asked Mr. Josowitz to write a letter asserting that she had an accrued bonus of $422,648 from Quantex as of March 25, 1998. Petitioner did not have an accrued bonus from Quantex, and Quantex never made a payment of $422,648 to petitioner or one of her corporations.

Petitioner asked Mr. Josowitz to write a letter asserting that her expected income from Quantex would be $450,000 for 1997, plus a $12,000 monthly housing allowance. As president, Mr. Josowitz received a salary of $60,000 annually from Quantex. He did not receive a living allowance.

Petitioner asked Mr. Josowitz to write a letter asserting that she had requested that Quantex transfer $450,000 in funds it was holding for her in 1997.

Quantum Diamonds, Inc. (Quantum), was incorporated in the United States. Mr. Josowitz was the vice president of Quantum. Mr. Josowitz was the only person authorized to write checks on the bank account of Quantum. Petitioner did not work for Quantum. Quantum did not pay petitioner a salary during 1997. Quantum did pay for petitioner's health insurance during 1997. The stock of Quantum was owned by some or all of the following members of the Kaszirer family: Ignatie Kaszirer, Mendy Kaszirer, and Bruno Goldberger.

Petitioner asked Mr. Josowitz to write a letter asserting that she received a salary from both Quantex and Quantum Diamonds.

Petitioner asked Mr. Josowitz to write a letter asserting that her living allowance was $15,000 per month for 1998.

Quantex made payments to Millennium at petitioner's request. Quantex did not use 1965 Broadway (owned by Millennium) for any business purpose.

Quantex lacked any relationship with petitioner or Energia by which it could obtain credit for any amounts it owed Energia for paying petitioner. Quantex had no relationship with any joint venture from Russia by which Quantex could obtain credit for any amount it owed the Russian joint venture for paying a third party, such as petitioner.

Heinrich and Cecilia Kremer (the Kremers) were Belgian citizens. Petitioner met the Kremers in Belgium. The Kremers and petitioner developed a relationship, and petitioner became "like a goddaughter" to them.

The Kremers did not have green cards which would have allowed them to reside in the United States for more than 90 days at a time. U.S. banks would not grant loans or sell mortgages to nonresidents who lack green cards. Petitioner allowed the Kremers to purchase in petitioner's name a house in which to live. The Kremers reimbursed petitioner for construction draws on the house.

Blue Diamond paid for health insurance for both of the Kremers.  Blue Diamond also paid for health insurance for petitioner.  Diane Katz at U.S. Trust Co. of New York received a letter from Heinrich Kremer, as president of Blue Diamond, saying that petitioner was due a bonus of $432,640.

In addition to her minor son DK and her son Bradley, petitioner has a daughter whose married name is Stacey Gaulding. Many of the personal expenses of petitioner and her three children, such as car payments, pool service payments, cellular telephone bills, automotive insurance, college and law school tuition, health insurance, and medical expenses, were paid out of the corporate bank accounts of Harbour Group, Inc., and Blue Diamond.  KRMT did not advise her to pay personal living expenses or those of her children out of the corporate bank account of Harbour Group, Inc.

The IRS audited petitioner's returns for taxable years 1997 through 2000.  Agent Curtis was assigned to the audit for petitioner's 1997 taxable year.  On May 28, 1999, as part of that audit Agent Curtis requested all documents used to determine the amount of gross income of $966,000 reflected on the Form 1116, Foreign Tax Credit, attached to petitioner's 1997 income tax return.  The only documents petitioner and her representatives provided were the Energia letters listing amounts paid to petitioner and amounts of tax withheld during taxable year 1997 and the Forms 3 relating to taxable years 1997 and 1998.  Agent

Curtis questioned the validity of the Energia letters submitted by petitioner's representatives.

Petitioner never provided the IRS with a calculation showing how her bonus or commission amounts from Energia were derived. Petitioner did not submit any data from either her financial accounts for taxable years 1997 through 2000 or the accounts of Energia showing actual payments to petitioner by Energia or deductions of income tax by Energia. Neither petitioner nor her representatives ever provided to the IRS: Documentation of the payment of income tax to the Russian Government by or on behalf of petitioner for any of taxable years 1997 through 2000; documentation from the Russian Government confirming receipt of alleged tax payments made on petitioner's behalf for taxable years 1997 through 2000; or documentation of the payments from Energia to petitioner during any of taxable years 1997 through 2000 inclusive showing where petitioner's alleged compensation from Energia was deposited or deposit slips showing the deposits of the alleged income into petitioner's accounts.

The IRS representative in Bonn, Germany, needed the address of Energia to assist Agent Curtis in his efforts to obtain information from the Russian tax authorities. On or about October 18, 1999, Agent Curtis requested the address from petitioner's representatives. Gary Hardie (Mr. Hardie) of KRMT was a representative of petitioner during the audit of petitioner's income tax returns for years 1997 through 2000.

On December 29, 1999, Mr. Hardie told Agent Curtis that Energia was out of business and no longer existed.

Before completing the audit for petitioner's taxable year 1997, Agent Curtis was assigned to a management detail. The IRS assigned the audit of petitioner's taxable year 1997 to Revenue Agent Susan Miradakis (Agent Miradakis). Agent Miradakis asked petitioner's representatives, both orally and in writing, to provide proof of petitioner's alleged income from Energia during the years in issue.

Agent Miradakis requested the address of Energia from petitioner's representatives. Petitioner later admitted that the claim that Energia was out of business was not true, and, on July 18, 2000, represented that "City of Moscow, Lubjanka Str. 22/24" was the current address of Energia in Moscow. Petitioner claimed that Energia had been at the address provided on July 18, 2000, "for the last several years." The address provided did not match a street address for Energia petitioner provided to Popular Mortgage Co. on April 9, 1999, only 1-1/2 years earlier.

The Unified Residential Loan Application that petitioner submitted to Popular Mortgage Co. during 1999 included a telephone number for Energia. Petitioner never provided a telephone number for Energia to the IRS. During the audit petitioner never provided addresses or phone numbers of her managers or coworkers at Energia.

Agent Miradakis asked petitioner's representatives, both orally and in writing, to provide information as to petitioner's foreign travel for taxable years 1997, 1998, and 1999. Petitioner's representative sent copies of pages from petitioner's passport to Agent Miradakis. The copies were largely illegible, a fact acknowledged by petitioner's representative at the time. In the light of the poor quality of the copies, the IRS examiner asked petitioner's representatives to set forth in writing the dates of petitioner's travel to Russia during the taxable years in issue.

Petitioner's representatives refused to provide a written schedule of petitioner's travel, stating that: (1) The information was "apparent in the passport we provided you"; (2) the entries and departures from Russia were in the back of her passport, starting on page 36; and (3) they did not believe the information was material to any issue concerning petitioner's income tax liabilities. Petitioner refused to provide documents relating to her foreign travels aside from a copy of her passport unless the IRS promised that her matters were solely civil in nature.

During the audit Agent Miradakis requested information concerning Millennium and Harbour Group, Inc. Specifically, Agent Miradakis requested that petitioner produce the Form 1120S filed on behalf of the two corporations for taxable years 1997 and 1998.

During the audit Agent Miradakis asked petitioner to produce the general ledgers and proof of "Additional Paid-in Capital" for Harbour Group, Inc., for taxable years 1996, 1997, and 1998, and Millennium for taxable years 1997 and 1998. For each company, Agent Miradakis also requested a 1998 schedule of the Accumulated Adjustments Accounts and documentation showing that distributions made to petitioner during taxable year 1998 were nontaxable distributions. Additionally, if additions to Additional Paid-in Capital had been made, then Agent Miradakis requested petitioner to produce documentation of any additions which were from petitioner's own funds. Petitioner's representatives responded that information relating to petitioner's S corporations was almost completed and should be available within a few days of May 1, 2001. Neither the Forms 1120S nor any of the other requested information was ever produced to Agent Miradakis during the audit.

On or about October 30, 2001, through her representative, petitioner told Agent Miradakis that there would be no further cooperation in the audit unless the IRS would guarantee in writing that her matters were solely civil in nature. At some point during 2001, petitioner and her representatives did cease all cooperation in the audit. All the documentary evidence relating to financial institutions was procured by the IRS through summonses issued by Special Agent Coffman to the respective financial institutions or to KRMT.

Special Agent Coffman issued a summons to KRMT during early 2002, requesting all documents KRMT had received from petitioner regarding the preparation of income tax returns for 1997 through 2000. KRMT promptly sent Special Agent Coffman two or three banker's boxes. KRMT did not withhold any documents from its file relating to petitioner on any grounds (including privilege) and represented that the boxes were the complete file. All documents in the files were stamped with a KRMT Bates stamp number, and there are no missing Bates stamp numbers in the documents provided.

Petitioner initially told accountant Jack Kirkland of KRMT that the amount of Russian tax withheld from petitioner's alleged pay from Energia was 52 percent of her gross wages for taxable year 1997. Petitioner told Mr. Hardie of KRMT that the withholding rate on her wages from Energia during taxable year 1998 had been 52 percent. On February 24, 2000, petitioner told KRMT that the withholding rate on her income from Energia was 51 percent during taxable year 1999 and that she thought it had been 51 percent during taxable year 1998. The withholding percentages were revised downward before the preparation of petitioner's 1997, 1998, and 1999 income tax returns. The percentages of alleged gross income claimed to have been withheld reported on the respective tax returns were 31.3 percent for taxable year 1996, 39.9 percent for taxable year 1997, 33.5 percent for

taxable years 1998 and 1999, and 28.9 percent for taxable year 2000.

Petitioner, through her representative, indicated to the IRS that the Energia letters submitted previously to the IRS bore the official stamp of the Russian Ministry of Taxation and were "substantially similar to a Form W-2". The Energia letters submitted to the IRS did not purport to bear the stamp of the Russian Ministry of Taxation but purported to bear the stamps of Energia and of the notary who certified the authenticity of the translator's signature.

On February 12, 2001, petitioner's representative communicated to Agent Miradakis that the withholding form used by the Russian Ministry of Taxation was a new form in taxable year 2000 and had not been in existence during the years in issue. Agent Miradakis learned from the Russian Ministry of Taxation that the Form 3 had been in use during the taxable years in issue. Agent Miradakis informed petitioner's representative that she had learned that Form 3 had been in use during the taxable years in issue. Agent Miradakis obtained a copy of a blank Form 3 from the Russian Ministry of Taxation and gave one to petitioner's representative. Later in the audit, petitioner retracted her statement that Form 3 had not been in use during the taxable years in issue, blaming confusion. After receiving a blank Form 3 from Agent Miradakis, petitioner presented to the IRS the Forms 3 relating to taxable years 1997 and 1998.

Petitioner claimed during the audit that an agent from the Russian Ministry of Taxation visited the Energia office every 2 weeks to collect her withholding tax. Agent Miradakis later learned that such a visit was impossible; taxes were withheld by the Russian payor and then paid over to a special account. Petitioner, through her representative, told Agent Miradakis that petitioner's Russian income taxes were collected every 2 weeks by an agent at the place of business. Agent Miradakis directed that the IRS make inquiries of accountants from Russia as to how Russians paid their taxes. As a result of the inquiries, Agent Miradakis was informed that Russian withholding taxes were deposited by the withholder to a special bank account, not collected personally.

Petitioner questioned the authenticity of documents provided to the IRS from the Russian Ministry of Taxation, claiming that they lacked the Ministry's official seal. Petitioner claimed that, on the basis of her experience, an official Government seal should appear to the left of the signature block on documents from the Russian Ministry of Taxation. Agent Miradakis investigated petitioner's claim regarding the placement of seals on Russian Ministry of Taxation correspondence. Agent Miradakis was informed that the Russian Ministry of Taxation did not typically place seals on their correspondence. Agent Miradakis viewed other letters from the Russian Ministry of Taxation, none of which had an official seal of the Ministry.

The Energia letters state that taxes were withheld pursuant to Russian law.  The letters do not make any mention of the use of third-party conduits to pay petitioner her salary or her bonuses during the taxable years in issue.

Petitioner told KRMT that Alex Cohen Consulting, Inc., had no operations during 1999.  Alex Cohen Consulting, Inc., had a corporate checking account and paid fees to the Florida Department of State as late as September 10, 2000.  Alex Cohen Consulting, Inc., paid petitioner $9,500 on December 14, 1998. Federal income tax returns (Forms 1120S) were filed on behalf of Alex Cohen Consulting, Inc., for all of the taxable years in issue reporting gross receipts of $40,000 for 1997.  Petitioner deposited money into and wrote checks on an account in the name of Alex Cohen Consulting, Inc., throughout all of the taxable years in issue.

The files KRMT provided to Special Agent Coffman contained no evidence of any payments by a Russian entity to petitioner.

At trial, petitioner claimed to have received a diploma from the Wharton Business School.  Petitioner misspelled Wharton as "Wartan" on the Uniform Residential Application she submitted to Popular Mortgage Co.

For taxable year 1997 petitioner reported adjusted gross income of $947,385 and had $360.57 withheld from her income and paid over to the IRS.  Petitioner claimed estimated tax payments

of $11,880 for taxable year 1997, stemming from either her 1996 tax return or estimated payments made during taxable year 1997.

For taxable year 1998 petitioner reported adjusted gross income of $1,251,394 and had $352.56 withheld from her income and paid over to the IRS. Petitioner claimed estimated tax payments of $25,560 for taxable year 1998.

For taxable year 1999 petitioner reported adjusted gross income of $1,073,450 and had zero withheld from her income. Petitioner claimed estimated tax payments of $24,450 for taxable year 1999.

For taxable year 2000 petitioner reported adjusted gross income of $721,694 and had zero withheld from her income. Petitioner claimed estimated tax payments of $26,173 during taxable year 2000, including $13,373 applied from her claimed overpayment from taxable year 1999.

Petitioner did not call her husband, Mendy Kaszirer, to testify at trial. Petitioner did not call any witnesses from Energia or any of the entities which participated in the joint ventures on which she worked to testify at the trial. Petitioner did not call a witness from the City of Moscow government or the Russian Government to testify at trial. Petitioner claims to have spent many days with the mayor of Moscow.

OPINION

Payment of taxes to a foreign Government may give rise to either a deduction or a credit.  See secs. 164, 901.[4]  Section 164(a)(3) provides that a deduction is allowed for foreign income taxes.  In lieu of the section 164 deduction, section 901(a) and (b)(1) permits a taxpayer to elect a credit for foreign income tax which meets the requirements set forth in the statute and the regulations promulgated thereunder.

Petitioner claims foreign tax credits during the taxable years in issue on account of foreign income tax she contends was

---

[4]SEC. 164.  TAXES.

(a) General Rule.--Except as otherwise provided in this section, the following taxes shall be allowed as a deduction for the taxable year within which paid or accrued:

* * * * * * *

(3) State and local, and foreign, income, war profits, and excess profits taxes.

SEC. 901.  TAXES OF FOREIGN COUNTRIES AND OF POSSESSIONS OF UNITED STATES.

(b) Amount allowed.--Subject to the limitation of section 904, the following amounts shall be allowed as the credit under subsection (a):

(1) Citizens and domestic corporations.--In the case of a citizen of the United States and of a domestic corporation, the amount of any income, war profits, and excess profits taxes paid or accrued during the taxable year to any foreign country or to any possession of the United States; * * *

withheld on her behalf by Energia and paid to the Russian Federation.  Petitioner has the burden of proving that she is entitled to the foreign tax credits she claims.

The purpose of the foreign tax credit is the reduction of international double taxation.  See Am. Chicle Co. v. United States, 316 U.S. 450, 452 (1942); Nissho Iwai Am. Corp. v. Commissioner, 89 T.C. 765, 776 (1987).  Nonetheless, permitting a credit for foreign income taxes "paid or accrued" is "an act of grace on the part of Congress", and a taxpayer seeking to benefit from such a credit must prove that all the conditions upon which its allowance depends have been fulfilled.  Irving Air Chute Co. v. Commissioner, 143 F.2d 256, 259 (2d Cir. 1944), affg. 1 T.C. 880 (1943).  With respect to income tax withheld at the source, such conditions include establishing that the foreign income tax for which credit is claimed was not only withheld, but paid over to the foreign taxing authority.  Cont. Ill. Corp. v. Commissioner, 998 F.2d 513, 516-517 (7th Cir. 1993), affg. on this point T.C. Memo. 1991-66; Norwest Corp. v. Commissioner, T.C. Memo. 1995-453.  Regulations require the taxpayer to submit "the receipt for each such tax payment".  Sec. 1.905-2(a)(2), Income Tax Regs.

The legislative history of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2085, clearly states that a foreign tax credit will be allowed only when the taxpayer is able to document not only that the foreign taxes have been withheld, but also that

they have been paid.  H. Conf. Rept. 99-841 (Vol. II), at II-594 (1986), 1986-3 C.B. (Vol. 4) 1, 594.  The conference report states:

> The conferees intend that the amount of any withholding tax paid be positively established through documentation provided in accordance with the requirements of Code section 905(b) and Treas. reg. sec. 1.905-2.  In this regard, the conferees emphasize that the mere fact that withholding took place does not necessarily constitute adequate proof of the amount of tax paid.

The conference report specifically addresses prior caselaw, stating that the rule set forth in Lederman v. Commissioner, 6 T.C. 991 (1946), which suggested that payment is proved ipso facto by the act of withholding, is subject to abuse.

Petitioner failed to produce any credible evidence of tax paid to the Russian Government.  She did not produce a receipt as contemplated in the regulations.  Petitioner provided no testimony by anyone involved in payment of the alleged foreign taxes in issue from either Energia or the Russian tax authorities.  Petitioner relies solely on the Energia letters and the Forms 3.

The Russian Government informed the IRS that petitioner was not a taxpayer and had not filed with them, although petitioner asserts that she was not required to file in Russia since she claimed no deductions or refunds.  Also, Energia had not filed tax returns since either 1993 or 1995.  On the basis of the record, we hold that petitioner has not met her burden of proving

that the tax she claims was paid to the Government of Russia was in fact paid.  Consequently, we hold that petitioner is not entitled to foreign tax credits under section 901 for the taxable years in issue.

Section 6663 Penalty

The Commissioner has the burden of proving fraud by clear and convincing evidence.  Sec. 7454(a); Rule 142(b).  To satisfy this burden, the Commissioner must show:  (1) An underpayment exists; and (2) the taxpayer intended to evade taxes known to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes.  Parks v. Commissioner, 94 T.C. 654, 660-661 (1990).  The Commissioner must meet that burden through affirmative evidence because fraud is never imputed or presumed.  Petzoldt v. Commissioner, 92 T.C. 661, 699 (1989).  If the Commissioner establishes that any portion of an underpayment in a particular year is attributable to fraud, the entire underpayment is treated as attributable to fraud, except with respect to any portion of the underpayment which the taxpayer establishes (by a preponderance of the evidence) is not attributable to fraud.  Sec. 6663(b).

Section 6663(a) imposes a penalty equal to 75 percent of the portion of any underpayment which is attributable to fraud.  The penalty in the case of fraud is a civil sanction imposed primarily as a safeguard for the protection of the revenue and to reimburse the Government for the heavy expense of investigation

and the loss resulting from a taxpayer's fraud. Helvering v. Mitchell, 303 U.S. 391, 401 (1938). Fraud is an intentional wrongdoing on the part of the taxpayer with the specific purpose to evade a tax believed to be owing. McGee v. Commissioner, 61 T.C. 249, 256 (1973), affd. 519 F.2d 1121 (5th Cir. 1975). The existence of fraud is a question of fact to be resolved from the entire record. Gajewski v. Commissioner, 67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978).

However, fraud need not be established by direct evidence, which is rarely available, but may be proved by surveying the taxpayer's entire course of conduct and drawing reasonable inferences therefrom. Spies v. United States, 317 U.S. 492, 499 (1943). Courts have relied on a number of indicia or badges of fraud in deciding whether to sustain the Commissioner's determinations with respect to the additions to tax for fraud. Although no single factor may be sufficient to establish fraud, the existence of several indicia may be persuasive circumstantial evidence of fraud. Solomon v. Commissioner, 732 F.2d 1459, 1461 (6th Cir. 1984), affg. per curiam T.C. Memo. 1982-603; Beaver v. Commissioner, 55 T.C. 85, 93 (1970).

Circumstantial evidence that may give rise to a finding of fraudulent intent includes: Understatement of income, inadequate records, failure to file tax returns, concealment of assets,

failure to cooperate with tax authorities, filing false documents, failure to make estimated tax payments, engaging in illegal activity, attempting to conceal illegal activity, dealing in cash, implausible or inconsistent explanations of behavior, an intent to mislead which may be inferred from a pattern of conduct, and lack of credibility of the taxpayer's testimony. Spies v. United States, supra at 499. The taxpayer's background and the context of the events in question may be considered circumstantial evidence of fraud. Spies v. United States, supra at 497; Bradford v. Commissioner, 796 F.2d 303, 307 (9th Cir. 1986), affg. T.C. Memo. 1984-601; Niedringhaus v. Commissioner, 99 T.C. 202, 211 (1992).

Respondent's assertion of fraud primarily relies on a theory that petitioner never worked for Energia and provided forged documents to support her claim that she did work for Energia. Respondent alleges that petitioner's income actually comes from working for Kaszirer Diamonds or is simply money embezzled from Kaszirer Diamonds or Kaszirer family trusts with the help of her husband. Petitioner responds that she is the victim of slander on the part of her brother-in-law and that she worked for Energia and had taxes withheld and any failure to pay taxes to the Russian Ministry of Taxation is due to fraud on the part of Energia.

Respondent makes much of petitioner's inability to prove conclusively that she actually worked for Energia and of her

implausible explanation of how she was paid by Energia. Respondent contends that adequate proof was presented showing that petitioner did not work for Energia. Respondent argues that since petitioner did not work for Energia, any documents from Energia must be forgeries and petitioner's income tax deficiencies for the taxable years in issue must be a product of fraud. However, we conclude on the basis of the record that respondent has not proved by clear and convincing evidence that petitioner did not work for Energia. Consequently, respondent's contentions, which largely flow from respondent's proposition that petitioner was never employed by Energia, while they raise suspicions, remain unproved by clear and convincing evidence.

Respondent also contends that the Forms 3 provided by petitioner are forgeries since petitioner claimed the Form 3 was not in use during taxable years 1997 and 1998 and the documents were not provided until after respondent furnished petitioner with a blank sample. Similarly, respondent takes the absence of Bates stamp numbers on the Energia letters to mean they were not a part of KRMT's files at the time of preparing petitioner's tax returns. Respondent contends that petitioner forged the letters or persuaded someone in Russia to produce them to support her claimed employment and foreign tax credits. However, respondent did not provide any testimony by an employee of the Russian Ministry of Taxation or a document expert or provide any other

clear and convincing evidence to prove any of the letters or forms are in fact forgeries.

While the circumstances do arouse substantial suspicion, we are mindful that it is respondent's burden to prove fraud by clear and convincing evidence. We find respondent's contentions without clear and convincing support in the record. While much of the evidence upon which respondent relies contributed to our holding on the deficiency issues, the evidence is not sufficiently persuasive, on a clear and convincing basis, to prove that petitioner's contentions are actually false. Accordingly, we hold that respondent has failed to carry respondent's burden of proof on a clear and convincing basis. Consequently, we hold that petitioner is not liable for the fraud penalty under section 6663.

Section 6662 Penalty

Respondent argues, in the alterative to the fraud penalty, that petitioner is liable for the accuracy-related penalty under section 6662. Respondent bears the burden of production under section 7491(c) and must come forward with sufficient evidence that it was appropriate to impose the penalty. See Higbee v. Commissioner, 116 T.C. 438, 446-447 (2001).

A taxpayer may be liable for a 20-percent penalty on any underpayment of tax attributable to negligence or disregard of rules or regulations. Sec. 6662(a) and (b)(1). "Negligence" is any failure to make a reasonable attempt to comply with the

provisions of the Internal Revenue Code, and "disregard" means any careless, reckless or intentional disregard. Sec. 6662(c). Negligence also includes any failure by a taxpayer to keep adequate books and records to substantiate items properly. See sec. 1.6662-3(b)(1), Income Tax Regs.

As to the issue of negligence, we conclude that respondent has met the burden of production. The evidence shows that petitioner failed to keep adequate books and records of her unique employment relationship and entitlement to foreign tax credits. Accordingly, we sustain respondent's determination that petitioner is liable for the accuracy-related penalty.

We have considered all of petitioner's contentions, and to the extent they are not addressed herein, they are irrelevant, moot, or without merit.

To reflect the foregoing,

Decisions will be entered

under Rule 155.